1   Jahan C. Sagafi (Cal. Bar No. 224887)
    OUTTEN & GOLDEN LLP
2   One Embarcadero Center, 38th Floor
    San Francisco, CA 94111
3   Telephone: (415) 638-8800
    Facsimile: (415) 638-8810
4   E-mail: jsagafi@outtengolden.com

5   Tammy Marzigliano (*pro hac vice* application forthcoming)
    Monique Chase (*pro hac vice* application forthcoming)
6   OUTTEN & GOLDEN LLP
    3 Park Avenue, 29th Floor
7   New York, New York 10016
    Telephone: (212) 245-1000
8   Facsimile: (646) 509-2060
    E-mail: tm@outtengolden.com
9   E-mail: mchase@outtengolden.com

10  *Attorneys for Plaintiff*

11

12                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
13            SAN FRANCISCO / OAKLAND DIVISION

14  ADAM LEVINE,                          DEMAND FOR JURY TRIAL

15                      Plaintiff,        CASE NO:

16        v.                              COMPLAINT FOR:

17  TPG CAPITAL, L.P., TPG GLOBAL,        1.  Violation of Federal Whistleblower Law
    LLC,
18                                        2.  Violation of State Whistleblower Law
                        Defendants.
19                                        3.  Wrongful Termination in Violation of
                                              Public Policy
20
                                          4.  Defamation and Self-Defamation
21
                                          5.  Breach of Contract
22
                                          6.  Failure to Pay Wages Upon Discharge
23
                                          7.  Accounting
24
                                          8.  Quantum Meruit
25
                                          9.  Promissory Estoppel
26

27

28

Plaintiff Adam Levine ("Plaintiff" or "Mr. Levine") alleges as follows:

**<u>INTRODUCTION</u>**

1.      This action arises out of the illegal and unlawful conduct of TPG Capital, L.P. and TPG Global, LLC (together with their affiliates and predecessors) against Adam Levine, who during the course of his employment alerted TPG's senior management that the Firm was engaged in practices that he reasonably believed violated securities laws, rules, and regulations, which, among other harms, resulted in TPG's investors being defrauded of millions of dollars in fees and expenses.

2.      Mr. Levine reported these issues to several of the Firm's senior partners and executives.  In response, those same senior partners and executives warned Mr. Levine that, if he continued to raise his concerns, they would ruin his "reputation," "future," and "career." Undeterred by such threats, Mr. Levine continued to raise these concerns, culminating in an email he sent to the Firm's founders, Jim Coulter and David Bonderman, in which he informed them that he felt he had no choice but to contact the Securities and Exchange Commission ("SEC") to disclose the violations he had raised with his employer to no avail.  Mr. Levine ultimately did contact the SEC, but not before TPG unlawfully retaliated against him for his protected disclosure, terminating him in retaliation for said disclosure.  TPG has since waged a relentless and unlawful campaign to smear Mr. Levine's reputation with the filing of a baseless and retaliatory lawsuit in the Northern District of Texas, Fort Worth Division.

3.      Further, upon terminating Mr. Levine, TPG withheld hundreds of thousands of dollars of vested non-cash compensation that was promised and owed to Mr. Levine.

PLAINTIFF'S COMPLAINT

**JURISDICTION AND VENUE**

4.     The United States District Court for the Northern District of California has personal jurisdiction over TPG Capital, L.P. and TPG Global, LLC (collectively "TPG," "Defendants," or the "Firm"), because both businesses maintain offices in the Northern District of California from which they do significant business in California and in this District, and because the acts complained of and giving rise to the claims alleged occurred in and emanated from this District.

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, based on Plaintiff's claims under Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111–203, H.R. 4173) ("Dodd-Frank").

6.     This court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over all other claims related to those claims that fall under the Court's original jurisdiction.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

**INTRADISTRICT ASSIGNMENT**

8.     Pursuant to N.D. Cal. Local Rule 3-2(c) and (d), intradistrict assignment to the San Francisco or Oakland Division is proper because a substantial part of the events that give rise to the claims asserted occurred in San Francisco County.

**THE PARTIES**

9.     Plaintiff Adam Levine is an individual who resides in the City of San Francisco, State of California, and during all times relevant to this complaint, he was employed by Defendants in the City of San Francisco.

PLAINTIFF'S COMPLAINT

10.     Defendants TPG Capital, L.P. and TPG Global, LLC are private equity firms incorporated in Delaware with headquarters in Fort Worth, Texas, at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102, and with offices at 345 California Street Suite 3300 in San Francisco, CA 94104.  At all times relevant to this complaint, TPG was doing business in the State of California at its California Street offices.  TPG is one of the largest private equity organizations in the world.

## FACTUAL ALLEGATIONS

11.     TPG structures its private equity funds as partnerships, which are composed of general and limited partners.  TPG's investment team consists of individual fund managers who form the fund's general partner entity ("GP"), and who typically invest between 1% and 5% of the capital in a fund.  The GP solicits the remaining capital from outside investors, each of whom is a limited partner ("LPs" or "investors").  LPs are usually a mix of sovereign wealth funds, corporations, and tax-exempt organizations, like public and private pension funds.  LPs contribute the overwhelming majority of a fund's working capital, but they are passive investors who are not involved with the day-to-day management of the fund.  The GP provides investment expertise in selecting, managing, and disposing of fund assets – usually referred to as "portfolio companies."  TPG Capital, L.P. and TPG Global, LLC are themselves structured as partnerships, in which the managers serve as general partners.

12.     Should a fund generate profit above a certain agreed-upon annualized rate of return, returns of capital contributions and distributions of profit are doled out between the fund's GP and LPs.  The percentage of profits that are distributed to GPs (typically 20% of the fund's profits) is known as carried interest or simply "carry."  Carry is incentive compensation, and it functions to align the interests of GPs and LPs.

PLAINTIFF'S COMPLAINT

13.   In addition to the prospect of receiving carry, GPs receive a management fee (typically 2% of a fund's size) from the fund's investors.  Management fees cover costs to administer the fund and compensate fund managers for their time and expertise.

**TPG Hires Mr. Levine**

14.   After a successful communications and public affairs career, starting as a professional staff member in the U.S. Senate, then as a producer and executive at NBC and ABC, and later working in the White House under President George W. Bush and for Goldman Sachs & Co. Mr. Levine began work for TPG in September 2007 under a consulting contract to build a public affairs capability for the Firm's general partnership.

15.   In January 2008, Mr. Levine joined TPG as Managing Director for Global Public Affairs.  His job responsibilities included managing the business, strategic, and crisis communications for TPG's dealings in the public and government domains.

16.   In addition to his annual compensation, TPG promised Mr. Levine a portion of the profits from deals upon which he worked.

17.   Mr. Levine's position with TPG required frequent travel; Mr. Levine spent an average of three weeks each month traveling to TPG's U.S. and international offices to work with its executives, deal teams, and consultants.  When not traveling, Mr. Levine frequently spent his weekends and nights preparing documents and presentations and reviewing files in his office at TPG's San Francisco location.

18.   During his years at TPG, Mr. Levine consistently exceeded performance expectations and he earned a reputation for adding considerable value to the success of TPG's portfolio companies and investments.

19.   Mr. Levine reported to Jerome Vascellaro, TPG's Chief Operating Officer.

PLAINTIFF'S COMPLAINT

20.     Mr. Vascellaro reported to TPG's chairman and founding partner, David Bonderman, and TPG's Chief Executive Officer and founding partner, Jim Coulter.

21.     In each of Mr. Levine's annual reviews, Mr. Vascellaro said Mr. Levine was highly valued, and Mr. Levine was frequently praised by deal teams and TPG's senior management for his work.

**Mr. Levine Engaged in Conduct Protected by State and Federal Whistleblower Laws**

22.     As Managing Director of TPG's Global Public Affairs department, one of Mr. Levine's duties was to provide a presentation at the TPG global weekly meeting showcasing news media stories relevant to TPG's business called, "TPG in the News."

23.     In mid-May 2014, Mr. Levine read "Spreading Sunshine in Private Equity," a speech delivered by the SEC's director for the Office of Compliance Inspections and Examinations, Andrew Bowden on May 6, 2014 (the "Bowden Speech"). The speech highlighted a number of governance and compliance practices in the private equity industry that run counter to securities laws and the investment adviser's fiduciary duties to investors.

24.     One issue the Bowden Speech addressed is a growing lack of transparency in the private equity industry and the use of abusive fee structures that improperly shift costs to LP investors. The Bowden Speech explained that, in addition to collecting management fees from LPs, unscrupulous firms often re-charge LPs additional fees for overhead expenses (such as legal or human resources personnel) – the very services the management fee is designed to cover. This practice allows the GP to double dip at the LP's expense and without the LP's knowledge.

25.     The Bowden Speech also addressed the private equity industry's use of consultants – a common practice that fund managers promote as a means of providing portfolio companies with specialized services that add value but that the portfolio companies could not independently afford. The Bowden Speech noted that some advisers falsely designate employees

PLAINTIFF'S COMPLAINT

as "consultants" to investors and, in turn, bill portfolio companies or the fund separately for their services. Under most limited partnership agreements between LP investors and GPs, fees generated by employees are either included in or offset against the GP management fee, whereas consultant fees are billed separately as an expense to the LPs.

26. After reading the Bowden Speech, Mr. Levine realized that many of the practices it characterized as "questionable," "problematic," "egregious," or even "violations of law," were commonplace at TPG.

27. Two issues at TPG stood out to Mr. Levine and formed the basis for the protected disclosures he would later make. First, Mr. Levine knew that over the years TPG increasingly focused its efforts on billing as much work as possible to its portfolio companies and funds regardless of whether work was being done for the benefit of those companies themselves. This effort had intensified over the previous 18 months as TPG prepared to list as a public company sometime in 2015.

28. Many TPG employees track and record the time they spend on a particular task. The work is then assigned a particular "code," indicating whether the work was on behalf of a particular portfolio company (and therefore billable to that company), a specialized service that fell outside the core work covered by the management fee (and therefore billable to the LPs), or whether the work related to the general fund management (and therefore billable to the GP and covered by the management fee).

29. Mr. Levine recalled the frequency with which Mr. Vascellaro instructed him to code the time he worked on deals beginning in 2011 and 2012. After reading the Bowden Speech, Mr. Levine had a growing suspicion that the pressure to code his time, and in some instances to "recode" his expenses, was on account of the Firm improperly shifting expenses away from its overhead and management expenses.

PLAINTIFF'S COMPLAINT

30.     The second issue that stood out to Mr. Levine, and that would form the basis of his later disclosures, was that the Firm gave investors inaccurate and misleading information about the track records of its investment team leaders in investor presentations and conferences.

31.     In mid-May 2014, Mr. Levine reported on the Bowden Speech as part of his "TPG in the News" presentation.

32.     By the end of June 2014, TPG began to take significant steps towards making an initial public offering ("IPO") – a massive undertaking that required attracting new investors, clearing regulatory hurdles, and - relevant to Mr. Levine - building an in-house public affairs department.  Mr. Levine had no staff, and he advised the Firm at its Summer Strategy conference that TPG would need to expand its public affairs capabilities to prepare for the IPO.

33.     Specifically, Mr. Levine suggested that TPG invest more resources in their public affairs effort, provide dedicated internal staff, and elevate his position to  partner.  Mr. Levine was clear in his communications that his recommendation that the Firm elevate his position would increase TPG's credibility with stakeholders and that his recommendation was not motivated by the need for increased compensation for himself.  When Mr. Levine spoke separately with Mr. Vascellaro at the conference about his proposal, Mr. Vascellaro responded that if Mr. Levine wanted to build an internal department he would have to staff it with consultants and contractors whose costs could be billed to the portfolio companies or LPs, rather than paid out of the management fees collected to cover GP operating expenses.  Troubled by Mr. Vascellaro's instruction, Mr. Levine told Mr. Vascellaro that he did not believe the Firm could engage in such practices, and he questioned whether Mr. Vascellaro had remembered the Bowden Speech.  Mr. Vascellaro ignored Mr. Levine's question.

PLAINTIFF'S COMPLAINT

34.     In early July 2014, Mr. Levine communicated directly with TPG founders, Mr. Coulter and Mr. Bonderman, about expanding and elevating TPG's press and government efforts in order to help shepherd through the IPO.  Mr. Coulter asked Mr. Levine to present a plan for expanding those functions at the board's next Executive Committee meeting.

35.     At the September 29, 2014, Executive Committee meeting, the committee approved Mr. Levine's proposal to expand the Firm's public affairs effort and authorized him to hire three outside firms to make specific recommendations for how the expansion should be executed.

36.     On October 20, 2014, the three outside firms presented plans for how to expand Mr. Levine's department.  All three plans recommended that TPG hire more staff internally and not rely on consultants, dedicate more resources, and elevate the head of the department to be a TPG partner.

37.     On October 22, 2014, Mr. Levine attended TPG's annual investor conference, an event at which TPG gathers its LP investors to present on the performance and strategy of its funds.  As Mr. Levine prepared to leave the event, he learned that at the conference at least one TPG fundraising group member made false representations to investors and potential investors about the tenure of TPG's Chief Investment Officer, Jonathan Coslet.  Specifically, a TPG fundraising professional told LP investors at the conference that TPG "made a change" in 2009 to install Mr. Coslet as its CIO and touted his successful investing track record.  In fact, Mr. Coslet had been CIO since 2007.  By stating that Mr. Coslet had not assumed the CIO position until 2009, TPG deceived investors and effectively absolved Mr. Coslet of responsibility for TPG's failed investments during 2007 and 2008, including Washington Mutual (which went bankrupt in 2008 and was the fastest loss in the history of private equity), TXU (the largest

PLAINTIFF'S COMPLAINT

leverage buyout in history which went bankrupt in 2014), and Caesar's (which would be bankrupt by 2015).

38.     During the October 2014 investor conference, Mr. Levine also became aware that TPG officers told investors that TPG's compensation structure was "clear and transparent," when, in fact, it was not.

39.     On October 24, 2014, Mr. Levine met with Mr. Vascellaro and raised the issue of TPG misrepresenting Mr. Coslet's tenure by stating he had not been CIO during the period when he made investments in historically bad companies.  Mr. Vascellaro again dismissed Mr. Levine's concerns and remarked, "Why let the facts get in the way of a good story?"  Mr. Vascellaro told Mr. Levine that his concern was not "a press issue" and that he should not worry about it.  When Mr. Levine also inquired about TPG's dubious claim to investors that its compensation structure was clear and transparent, Mr. Vascellaro became angry and told Mr. Levine not to worry about that, either.

40.     At the October 27, 2014 Executive Committee meeting, the committee authorized Mr. Levine to expand the public affairs department.  However, completely disregarding the recommendations of Mr. Levine and the three outside firms, Bill McGlashan, a partner and head of TPG's Growth and Corporate Development divisions, remarked that he received the TPG Growth General Counsel's time (as well as almost all of the work in the legal department) "for free" by billing their time either to portfolio companies or to LPs.  He suggested that the newly expanded public affairs department could operate the same way.

41.     On October 28, 2014, Mr. Levine met with Mr. Vascellaro.  During their meeting, Mr. Vascallero instructed Mr. Levine to set up his department the way Mr. McGlashan operated the TPG Growth legal department, i.e., hiring only consultants and contractors and billing as much time as possible to portfolio companies or LPs.  Mr. Levine responded by telling

PLAINTIFF'S COMPLAINT

Mr. Vascellaro, "we're not allowed to do it like that," and "the SEC said we can't do it that way." Mr. Vascellaro said, "Well, that's the only way this is going to happen around here." Frustrated, Mr. Levine stated that the two of them would "have to agree to disagree," and their meeting ended.

42.     On October 29, 2014, Mr. Vascellaro called Mr. Levine into a meeting with TPG founding partners, Mr. Coulter and Mr. Bonderman. They instructed Mr. Levine to staff his department with contractors in order to shift fees to LPs and portfolio companies, instead of paying those costs out of the management fee. Mr. Coulter added that, if Mr. Levine successfully "built out" the effort in the way he suggested, he would elevate Mr. Levine to partner after the IPO.  Mr. Coulter's remark was clear – TPG was linking its decision to elevate Mr. Levine's position to his acquiescing to the plan to build a non-compliant public affairs department.

43.     Determined to find someone who would listen to his concerns about SEC compliance, on October 31, 2014, Mr. Levine called TPG partner and senior counsel Clive Bode. Mr. Levine knew that Mr. Bode was close to Mr. Bonderman, so Mr. Levine told Mr. Bode he didn't want to put him "in a bad spot," but that Mr. Vascellaro was pressing Mr. Levine to structure the new public relations department in a "non-compliant" way. Mr. Bode agreed that such an arrangement could present "problems" with compliance, and he commented that given Mr. Vascellaro's nature and his influence over Mr. Coulter, nothing could be done.

44.     During the October 31, 2014, conversation with Mr. Bode, Mr. Levine also recounted Mr. Vascellaro's reaction to the story of TPG representing that Mr. Coslet had become CIO in 2009, when in fact he had come on as CIO in 2007 had and overseen catastrophic investments through the financial collapse; Mr. Levine told Mr. Bode that there appeared to be a growing problem at TPG giving investors inaccurate and misleading information. Mr. Bode

PLAINTIFF'S COMPLAINT

warned Mr. Levine not to push the issue "and wait until January," so as to not jeopardize Mr. Levine's end-of-the-year bonus.  Although Mr. Levine's "bonus" provided a substantial part of his overall compensation, Mr. Levine felt strongly about these issues and decided not to let them go unchallenged.

45.     On November 1, 2014, Mr. Levine called TPG Senior Partner Michael MacDougall and explained his concern that, based on his reading of the Bowden Speech, structuring the public relations department with contractors who would be billed to LPs and portfolio companies for their work on an IPO would violate SEC guidelines.  Mr. MacDougall asked whether Mr. Levine's concerns would be allayed if he was given a raise and a partnership with TPG.  Mr. Levine replied that a raise and a partnership were far from the point.  Mr. MacDougall asked Mr. Levine "to give [him] 24 hours" to think about the matter.

**TPG Retaliates against Mr. Levine for his Protected Conduct**

46.     On November 2, 2014, Mr. MacDougall called Mr. Levine to say that he had spoken with Mr. Bode and that they thought it would be best to "get [Mr. Levine] a job outside the Firm."  When Mr. Levine objected, Mr. MacDougall warned Mr. Levine that his "reputation," "future," and "career" would be at risk if things "end[ed] badly" between Mr. Levine and TPG.  Mr. Levine told Mr. MacDougall that the Firm was putting itself at great risk given the seriousness of the regulatory and compliance issues involved. In response, Mr. MacDougall simply asked Mr. Levine for a "number" he would take to leave the Firm "quietly." Shocked and disappointed by Mr. MacDougall's reaction, Mr. Levine did not provide one and ended the conversation.

47.     Frustrated by the turn of events, Mr. Levine attempted to raise the issue to a larger group of senior executives.  Later, on November 2, 2014, Mr. Levine sent an email to Mr. Vascellaro; he copied Mr. Bode and the TPG executives who authorized Mr. Levine to expand

PLAINTIFF'S COMPLAINT

the public affairs department. Mr. Levine alluded to his earlier conversations with Mr. Vascellaro in the email and explained why he believed that structuring the public affairs department with consultants and contractors in the way Mr. Vascellaro prescribed was unworkable for TPG "as a regulated entity" and in view of "its public employee pension fund" and "investor base." Mr. Levine made clear that his position was not the result of wanting "the power and prestige associated with any title or rank" and that the Firm needed to take seriously the task of developing a "practicable plan."

48. In the following days, it became clear that Mr. Levine's communication had sparked the ire of the Firm had and enhanced its motivation to push Mr. Levine out of TPG. On November 3, 2014, Mr. Bode spoke with Mr. Levine and warned him that he should have heeded his earlier advice to hold off on his complaint. Mr. Bode then proceeded to explain that Mr. Bonderman, Mr. McGlashan, and Mr. Vascellaro were all "annoyed" by Mr. Levine's email and that, had Mr. Levine addressed his email to Mr. Bode directly, he would have "hunted" Mr. Levine down and "gutted [him] like a carp."

49. The next day, on November 4, 2014, Mr. Levine spoke with Mr. McGlashan who told Mr. Levine his career would be "ruined" if he continued to press issues about staffing his department with contractors, and he suggested that Mr. Levine work outside of the Firm.

50. On November 5, 2014, Mr. Levine emailed Mr. MacDougall and copied Mr. Bode. In his email, Mr. Levine expressed his discontent that Mr. MacDougall had threatened him after he raised his concerns in their earlier conversation; Mr. Levine specifically referenced Mr. MacDougall's threats that Mr. Levine's "reputation," "future," and "career" would be ruined. When Mr. Levine followed up with Mr. Bode about his email the following day, Mr. Bode said,

"Take this little game as far as you want Levine, but if you bring Bonderman into it, I will fucking kill you."

51.     Although Mr. Levine's complaints had been met with continuous threats and severe pushback, he still believed it important and worthwhile to raise his concerns directly with TPG's founders.  On November 6, 2014, Mr. Coulter emailed Mr. Levine and asked that they meet together in San Francisco over the upcoming weekend.

52.     The next day, on November 7, 2014, Mr. Bonderman called Mr. Levine and said that, given Mr. Levine's "disagreement" with Mr. Vascellaro over the structure of the department, Mr. Levine should transition to an "adviser" role and find something else to do "outside of TPG."  Mr. Levine told Mr. Bonderman that he understood but that they should still meet with Mr. Coulter over the weekend because it was important that they understood Mr. Levine's concerns.

53.     Before his weekend meeting with Mr. Coulter, Mr. Levine told Mr. Bode that he planned to detail his concerns to Mr. Coulter about the way he was being instructed to structure his department and about other compliance and regulatory issues.  Mr. Bode exploded in anger; he told Mr. Levine that he was being "foolish" and if he were in the same room with him at that moment he would "smack" Mr. Levine's head into a wall and "knock some fucking sense" into him.  Mr. Bode added that Mr. Levine's planned conversation with Mr. Coulter would end badly, but Mr. Levine persisted and assured Mr. Bode that he would respectfully raise his concerns with Mr. Coulter.

54.     On November 9, 2014, Mr. Levine met with Mr. Coulter, with Mr. Bode in tow.  Mr. Levine once again used the meeting as an opportunity to explain why he believed SEC regulations would not allow the Firm to structure his department in the way the Firm demanded and why he believed the issues he raised put the Firm and their investors at great risk. Mr. Coulter

PLAINTIFF'S COMPLAINT

responded only that he had spoken with Mr. Bonderman and that he agreed that it was time for Mr. Levine to "transition out." However, Mr. Coulter and Mr. Bonderman were scheduled to appear in a live television interview to be broadcast on November 14, 2014, in Washington, D.C., and Mr. Coulter asked Mr. Levine to attend in person while the interview was conducted. Mr. Levine agreed. Mr. Levine asked Mr. Coulter that Mr. Bode, and not Mr. Vascellaro, be put in charge of the transition. Mr. Coulter agreed.

55.     On November 15, 2014, Mr. Bonderman and Mr. Levine met in Washington, D.C. Mr. Levine reiterated his concern that, based on the Bowden Speech, he believed TPG's policies violated securities laws. Mr. Bonderman reiterated his position that it was time for Mr. Levine to "move on;" to that end, he instructed Mr. Levine to provide a transition plan. At the end of the meeting, as he had with Mr. Coulter, Mr. Levine asked Mr. Bonderman that Mr. Bode, and not Mr. Vascellaro, be put in charge of the transition. Mr. Bonderman agreed.

56.     On November 18, 2014, Mr. Levine submitted a transition plan to Mr. Bonderman, Mr. Coulter, and Mr. Bode. The plan did not propose a firm end date for Mr. Levine's employment with TPG, and it contemplated Mr. Levine staying on at TPG while he helped to facilitate the transition.

57.     On November 25, 2014, Mr. Bode called to see if Mr. Levine would be interested in taking a six month "cooling off" period. Mr. Levine asked Mr. Bode whether Mr. Coulter and Mr. Bonderman had signed off on the idea. When Mr. Bode confessed they had not, the issue was dropped.

58.     On December 2, 2014, Mr. Bode informed Mr. Levine that he would receive a severance package, but Mr. Bode explained that, while he would handle negotiations, Mr. Vascellaro – the very person at the forefront of Mr. Levine's conflict at TPG – would be in

PLAINTIFF'S COMPLAINT

charge of giving final approval on the package.  When Mr. Levine objected to the clear conflict of

Mr. Vascellaro being involved in his severance decision, Mr. Bode replied, "Too fucking bad,

you are a non-partner employee who is leaving voluntarily," – a complete untruth.

**TPG Breaches Contract Agreements with Mr. Levine in Retaliation for his Whistleblowing**

59.     On December 3, 2014, Mr. Bode told Mr. Levine that his severance would

include "all of [his] vested and unvested" non-cash compensation, plus payment of his 2014 and

2015 bonus.  Mr. Bode also added that any agreement would "include an airtight non-disclosure

agreement."  Mr. Levine responded that, given the seriousness of the issues and behavior he had

witnessed at TPG, signing a non-disclosure agreement ("NDA") was "going to be very difficult

for [him] to do."  Growing angry, Mr. Bode told Mr. Levine that an NDA was "required."  He

added, "Everyone signs and you will sign it or you will get fucking nothing – not even what's

vested."

60.     Since it was clear that the NDA issue was not up for discussion, Mr.

Levine refocused the conversation and asked Mr. Bode for a final accounting of his non-cash

compensation, or distribution of the carried interest he had accrued - an accounting of which Mr.

Vascellaro had promised him after each of his year-end reviews, yet never provided.  Mr. Bode

said he would look into the matter and respond to Mr. Levine's request.

61.     On December 5, 2014, Mr. Levine called Mr. Bode to renew his request for

an accounting of his non-cash compensation, but Mr. Bode said he was unable to provide such

information at that time.

62.     On December 15, 2014, Mr. Bode forwarded Mr. Levine an email that Mr.

Vascellaro had sent Mr. Bode earlier that day.  The email included a table that indicated that Mr.

Levine was entitled to a payout of at least $738,761, based on TPG's calculations of his vested

accrued value and vested "dollars at work" from 2010 through 2014.  As Mr. Levine began

PLAINTIFF'S COMPLAINT

working for TPG in 2008, he called Mr. Bode and asked why the figures for 2008 and 2009 were not included in the calculations. Mr. Bode was not sure at that time.

63. On December 19, 2014, Mr. Levine emailed Mr. Bode to follow-up on his questions about why the figures for 2008 and 2009 were not included in the table calculating Mr. Levine's vested interest in the Firm. Mr. Bode responded that the Firm had no other documentation indicating what Mr. Levine's stake in the Firm would be; but he added that, if Mr. Levine had any such document, TPG would honor it.

64. On December 20, 2014, Mr. Levine went to the San Francisco office to review his files to see whether he could piece together any communications indicating what his stake in the Firm should be.

65. On or about December 23, 2014, Mr. Levine called TPG's general counsel, Ron Cami, to let him know that his transition was not going smoothly, that the Firm's partners did not seem to be taking seriously his concerns about securities violations, and that they were retaliating against him for raising those concerns. Mr. Levine told Mr. Cami he felt he had no choice but to contact external authorities, i.e., the SEC. Mr. Cami agreed that things were "out of control" under Mr. Vascellaro's management and thanked Mr. Levine for coming forward, calling him "a man of honor."

66. On or about December 23, 2014, Mr. Levine also placed a call to Michael Ryan, a senior partner with the law firm Cleary, Gottlieb, Steen & Hamilton LLP, who frequently served as outside counsel to TPG. On the call, Mr. Levine explained to Mr. Ryan that he had profound concerns about potential securities law violations at TPG and the Firm's reaction to those concerns being raised. Mr. Levine told Mr. Ryan that he felt he had no choice but to report the Firm's possible violations to external authorities, including the SEC.

67.     On December 24, 2014, Mr. Levine sent an email to Mr. Bode, Mr. Bonderman, and Mr. Coulter (attached as Ex. 1).  In his email, Mr. Levine documented his nearly two month plight in trying to get senior members of TPG to appreciate the "potentially unlawful, noncompliant and illegal activities" that arose with the Firm's structure and allocation of expenses between funds and the general partners.   Mr. Levine also raised his concerns about the Firm's misrepresentations to investors (i.e., that Mr. Coslet had become CIO in 2009, when in fact he became CIO in 2007).  Mr. Levine stated that, if TPG continued to ignore his concerns and retaliate against him for raising them, he would have no choice but to contact external authorities, including the SEC.

68.     Later on December 24, 2014, Mr. Bode responded that he had received the email Mr. Levine had sent and that he would respond "in due course."

69.     Just one week later, Mr. Levine received a letter dated December 31, 2014, from the law office of Kasowitz Benson Torres & Friedman, informing him that his employment with TPG had been terminated.  Additionally, TPG asserted false and baseless claims that Mr. Levine had threatened TPG employees and breached confidentiality agreements.

70.     On January 26, 2015, TPG filed a lawsuit in the Northern District of Texas against Mr. Levine, falsely accusing him of attempting to extort "millions" from the Firm and breaching confidentiality agreements he had signed.  The lawsuit also falsely accused Mr. Levine of leaking confidential documents and information to the *New York Times* – another complete untruth.

71.     Within a week after TPG filed suit against Mr. Levine, media outlets including the *Wall Street Journal*, *Reuters*, and *CNBC* ran stories about Mr. Levine's termination and TPG's subsequent lawsuit, severely damaging Mr. Levine's "reputation," "future," and "career" – just as Mr. MacDougall had promised.  As a result of the lawsuit, Mr.

PLAINTIFF'S COMPLAINT

Levine was forced to resign from an employment opportunity he had secured in late December 2014.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Whistleblower Retaliation**
**Dodd-Frank Act, 15 U.S.C. § 78u–6(h)** *et seq.*
**Against All Defendants**

72.     Mr. Levine realleges and incorporates by reference all allegations in the preceding paragraphs.

73.     As an employee of a financial services provider, Mr. Levine's whistleblowing conduct is covered by the Dodd-Frank Act, 15 U.S.C. § 78u-6(h) *et seq*.

74.     Mr. Levine had a good faith and reasonable belief that TPG's practices were in violation of SEC regulations.  Specifically, Mr. Levine believed that TPG improperly billed LPs and portfolio companies in a manner intended to shift expenses away from its overhead and management expenses and impose them on investors.  Mr. Levine also believed that the Firm made misrepresentations to investors regarding the track record of its investment team members.

75.     Mr. Levine made protected disclosures to TPG senior partners, executives, and compliance officers, when he explicitly told them that he was worried that the Firm's billing practices and misrepresentations to investors about its investment team violated securities rules.

76.     As a consequence of his protected disclosures, TPG retaliated against Mr. Levine.

77.     As a result of TPG's unlawful acts, Mr. Levine has been damaged and is entitled to reinstatement and recovery of twice the amount of back pay otherwise owed to him, with interest, as well as compensation for litigation costs, expert witness fees, attorneys' fees, costs, and other compensation, pursuant to 15 U.S.C. § 78(h)(C).

### SECOND CLAIM FOR RELIEF
#### (Whistleblower Retaliation)
#### (California Labor Code §§ 1102.5)
#### (Against All Defendants)

78.     Mr. Levine realleges and incorporates by reference all allegations in the preceding paragraphs.

79.     Under California Labor Code § 1102.5(b), which was in effect and binding on Defendants at all times relevant to this complaint, an employer may not retaliate against an employee for disclosing information – and may not retaliate if the employer believes the employee *may* disclose information – to a person with authority over the employee or to another employee who has the authority to investigate, discover, or correct the complained of violation or noncompliance where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

80.     California Labor Code § 1102.5(c), which was in effect and binding on Defendants at all times relevant to this complaint, further provides that an employer may not retaliate against an employee for refusing to participate in an activity that would result in violation of state or federal laws or regulations or non-compliance with state or federal laws or regulations.

81.     As set forth above, Mr. Levine reasonably believed that TPG's policies violated federal laws and regulations, told TPG that he maintained such reasonable belief, and informed TPG that he was prepared to report TPG's conduct to external authorities.  In response, TPG retaliated against Mr. Levine and, ultimately, terminated his employment.

82.     By terminating Mr. Levine, refusing to pay him compensation due and owing, defaming him, and undertaking acts that may further be discovered, TPG violated Labor Code § 1102.5.

83.     Because the discriminatory and retaliatory acts were committed by TPG, including its officers, directors and/or managing agents, who acted with malice, oppression or fraud, or were deliberate, willful and in conscious disregard of the probability of causing injury to Plaintiff, Mr. Levine seeks punitive damages against TPG in order to deter them from such conduct in the future.

84.     As a proximate cause of the wrongful conduct of TPG, Mr. Levine has suffered harm, humiliation, emotional distress, mental pain and anguish, and job loss and is entitled to lost wages and benefits, job reinstatement, penalties, punitive damages, and attorney fees and costs.

### THIRD CLAIM FOR RELIEF
### (Whistleblower Retaliation)
### (California Common Law, Termination in Violation of Public Policy)
### (Against All Defendants)

85.     Mr. Levine realleges and incorporates by reference all allegations in the preceding paragraphs.

86.     The well-established public polices at issue in this case include California Labor Code §§ 1102.5(c) and 2856, 15 U.S.C. § 78u–6(h), under the Investment Advisers Act of 1940 and its related rules, 17 C.F.R. § 275.0 *et seq*, and various rules and regulations of the SEC governing communications to groups of investors and how a private equity firm can assign expenses among portfolio companies, LPs, and GPs.

87.     Specifically, the public policy of Labor Code § 1102.5 and other applicable law is to: (1) prohibit employers from implementing policies preventing employees from disclosing reasonably based suspicions of violations of state or federal laws and regulations; (2) retaliating against employees who have indicated they will disclose or have disclosed reasonably

PLAINTIFF'S COMPLAINT

based suspicions of violations of such laws and regulations; and (3) retaliating against employees who refuse to participate in activities that would result in violations of such laws and regulations.

88.     As set forth above, Mr. Levine told TPG that he believed its policies violated federal laws and regulations and that he was prepared to report TPG's conduct to external authorities.  In response, TPG retaliated against Mr. Levine and, ultimately, terminated his employment.

89.     Because the discriminatory and retaliatory acts were committed by TPG, including its officers, directors and/or managing agents, who acted with malice, oppression or fraud, or were deliberate, willful and in conscious disregard of the probability of causing injury to Plaintiff, Mr. Levine  seeks punitive damages against TPG in order to deter them from such conduct in the future.

90.     As a proximate cause of the wrongful conduct of TPG, Mr. Levine has suffered harm, humiliation, emotional distress, mental pain and anguish and job loss and is entitled to lost wages and benefits, job reinstatement, penalties, punitive damages, and attorney fees' and costs.

**FOURTH CLAIM FOR RELIEF**
**(Defamation and Compelled Self-Defamation)**
**(California Civil Code §§ 45, 46)**
**(Against All Defendants)**

91.     Mr. Levine realleges and incorporates by reference all allegations in the preceding paragraphs.

92.     TPG filed suit against Mr. Levine and asserted wholly false, defamatory, and unprivileged claims that he breached confidentiality agreements he signed and misappropriated confidential documents and information.

93.     As a direct result of TPG's false and retaliatory suit, as well as the litany of press reports that republished TPG's false claims against him, Mr. Levine was compelled to

- 21 -

disclose TPG's defamatory claims against him to a new employer with whom he had commenced employment. After making his disclosure, Mr. Levine was forced to resign his employment.

94. As a result of TPG's false statements, Mr. Levine has been injured in his profession and continues to be injured in his profession. Mr. Levine has sustained and continues to sustain losses of earnings and other employment benefits.

95. TPG, including its officers, directors and/or managing agents, committed acts with malice, oppression or fraud, or were deliberate, willful and in conscious disregard of the probability of causing injury to Mr. Levine, Mr. Levine therefore seeks punitive damages against TPG in order to deter them from such conduct in the future.

96. As a proximate cause of the wrongful conduct of TPG, Mr. Levine has suffered harm, humiliation, emotional distress, mental pain and anguish and job loss and is entitled to lost wages and benefits, job reinstatement, penalties, punitive damages, attorneys' fees, and costs.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Contract)**
**(Against All Defendants)**

97. Mr. Levine realleges and incorporates by reference all allegations in the preceding paragraphs.

98. TPG breached the contract it entered into with Mr. Levine when it refused to pay him the vested non-cash compensation owed to him from 2008 through 2013.

99. Mr. Levine performed all of the conditions and obligations imposed upon him.

100. As TPG has failed to provide complete accounting of compensation due to Mr. Levine, and accrued non-cash compensation, he is entitled to actual damages in the amount of no less than $738,761.

PLAINTIFF'S COMPLAINT

### SIXTH CLAIM FOR RELIEF
#### (California Labor Code §§ 201, 203)
#### (Against All Defendants)

101.   Mr. Levine realleges and incorporates by reference all allegations in the preceding paragraphs.

102.   At the time of Mr. Levine's termination on December 31, 2014, he was due certain wages from TPG pursuant to the terms of his employment, including his vested non-cash compensation from 2008 through 2013.

103.   TPG refused to pay to Mr. Levine his vested non-cash compensation upon his termination and those wages remain unpaid to date.

104.   Under California Labor Code §§ 201 and 203, Mr. Levine is entitled to 30 days continued wages as a penalty for TPG's willful failure to pay wages when due, in an amount according to proof, as well as attorneys' fees and costs.

### SEVENTH CLAIM FOR RELIEF
#### (Accounting)
#### (Against All Defendants)

105.   Mr. Levine realleges and incorporates by reference all allegations in the preceding paragraphs.

106.   TPG promised Mr. Levine the non-cash compensation owed to him from 2008 through 2013.

107.   TPG failed to provide Mr. Levine with a complete accounting of his non-cash compensation from 2008 through 2013.

108.   Upon information and belief, Mr. Levine's accrual and distribution of carried interests are determined in accordance with TPG's policies for awarding such interests.

109.   Upon information and belief, the policies and records governing Mr. Levine's accrual and distribution of carried interests are in the sole possession of TPG.

PLAINTIFF'S COMPLAINT

110.     As the exact amount of non-cash compensation that is owed to Mr. Levine is unknown, Mr. Levine is entitled to and demands an accounting.

## EIGHTH CLAIM FOR RELIEF
### (Quantum Meruit)
### (Against All Defendants)

111.     Mr. Levine realleges and incorporates by reference all allegations in the preceding paragraphs.

112.     TPG made representations to Mr. Levine about his non-cash compensation during year-end performance reviews from 2008 through 2013.

113.     As a result of TPG's promises, Mr. Levine continued to work for TPG and rendered services to TPG that benefited the Firm and allowed it to continue reaping profits from deals on which he worked.

114.     Mr. Levine asks the Court to enforce the promises and award him damages in the amount of compensation he is owed by TPG.

## NINTH CLAIM FOR RELIEF
### (Promissory Estoppel)
### (Against All Defendants)

115.     Mr. Levine realleges and incorporates by reference all allegations in the preceding paragraphs.

116.     TPG made promises to Mr. Levine designed to induce reliance.

117.     Mr. Levine reasonably relied to his substantial detriment on promises regarding the non-cash compensation that TPG awarded him by staying at the Firm.

118.     Mr. Levine asks the Court to enforce the promises made to him and award him damages in the amount of compensation he is owed by TPG.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Adam Levine, prays for relief as follows:

PLAINTIFF'S COMPLAINT

A.   Back pay, front pay, reinstatement, and other special damages;

B.   General damages to compensate Mr. Levine for emotional distress, pain and

suffering, and loss of enjoyment of life;

C.   An accounting, as alleged in the Seventh Claim For Relief;

D.   Punitive damages;

E.   Pre-Judgment interest;

F.   Attorneys' fees and costs of this action, including expert fees; and

G.   Such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial on all causes of action and claims with respect

to which he has a right to jury trial.

Dated:  April 2, 2015                     Respectfully submitted,

By:  _____
        Jahan C. Sagafi

Jahan C. Sagafi (Cal. Bar No. 224887)
OUTTEN & GOLDEN LLP
One Embarcadero Center, 38th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-mail: jsagafi@outtengolden.com

Tammy Marzigliano (*pro hac vice* application forthcoming)
Monique Chase (*pro hac vice* application forthcoming)
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-mail: tm@outtengolden.com
E-mail: mchase@outtengolden.com

*Attorneys for Plaintiff*

PLAINTIFF'S COMPLAINT